**AKANTHOS CAPITAL MAN-
AGEMENT, LLC, et al.,
Plaintiffs,**

v.

**COMPUCREDIT HOLDINGS
CORPORATION, et al.,
Defendants.**

**Civil No. 1:10–cv–844–TCB.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 15, 2011.

---

Harry N. Niska, Jeff I. Ross, John Orenstein, Ross & Orenstein, LLC, Minneapolis, MN, Heather Smith Michael, Karen Barris Bragman, Kevin B. Getzendanner, Arnall Golden & Gregory, Atlanta, GA, for Plaintiffs.

J. Timothy Mast, James David Dantzler, Jr., Thomas B. Bosch, Troutman Sanders, LLP, Jeffrey O. Bramlett, John H. Rains, IV, Bondurant Mixson & Elmore, Atlanta, GA, for Defendants.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This matter is before the Court on motions to dismiss brought by (1) Defendant CompuCredit Holdings Corporation ("CompuCredit") [124], (2) Defendants David G. Hanna, Frank J. Hanna, III, Richard R. House, Jr., Richard W. Gilbert, K.K. Srinivasan, and J. Pal Whitehead, III[133], and (3) Defendants Thomas G. Rosencrants and Gregory J. Corona [134].

## I. Background

Plaintiffs describe this litigation as a test case to determine "whether creditors of rapidly failing companies may pursue Uniform Fraudulent Transfer Act ("UFTA") claims against insiders who plunder the corporation for self gain." [139, p. 1] [1]

---

1. Plaintiffs' second amended complaint (the "complaint") alleges that Defendants violated UFTA (count one) and breached covenants of good faith and fair dealing (counts two and three). Plaintiffs have consented to dismissing without prejudice counts II and III of the complaint "insofar as the relief sought with respect to those claims was equitable in nature and now is moot in light of the Court's denial of Noteholders' request for injunctive

Plaintiffs allege that CompuCredit is a publicly traded subprime financial services provider that is primarily owned by CEO David Hanna and his brother Frank.[2] Plaintiffs are holders of the following CompuCredit notes: (1) 3.625% convertible senior notes due in 2025, issued pursuant to May 27, 2005 indenture; and (2) 5.875% convertible senior notes due in 2035, issued pursuant to a November 23, 2005 indenture. About $387 million in CompuCredit's notes are outstanding, with about $230 million of that amount due to be repurchased in May 2012. Plaintiffs contend that because they collectively own or have an interest in a majority of the notes, they are CompuCredit's creditors under the UFTA. According to Plaintiffs, Defendants are defrauding CompuCredit's noteholders by transferring the company's assets to themselves (as the primary stockholders), while knowing that doing so will make it impossible for CompuCredit to repurchase the notes when they become due.

Plaintiffs assert that on November 9, 2009, CompuCredit notified the market that it was in severe financial distress by reporting on its quarterly filing its decreasing asset values, increasing losses, and lack of liquidity, and by indicating that it would not be able to repurchase the $230 million of notes due in 2012. Plaintiffs allege that the company's November 2009 10–Q showed that it had lost $487 million year-to-date, and that its 2009 10–K showed a $541 million loss by that year's end; further, shareholder equity by year's end was $189 million, representing 26% of its value in the prior year. Plaintiffs contend that CompuCredit has repeatedly announced its losses, stating in its January 2010 Securities and Exchange Commission disclosure that it had lost up to $60 million in the fourth quarter of 2009 and that it anticipated additional losses in 2010. Plaintiffs assert that CompuCredit's equity fell from $747 million in December 2008 to $195 million in March 2010. Plaintiffs further assert that on a pro-forma balance sheet basis, CompuCredit is already insolvent.

Plaintiffs allege that CompuCredit also stated in its November 2009 10–Q and its 2009 10–K that it would not be able to repurchase the 3.675% notes in May 2012 without relying upon debt or equity issuance or exchange offerings. Thus, Plaintiffs allege that at least by November 2009, CompuCredit was not only objectively aware of its likely inability to repurchase the notes due in May 2012, but had also publicly announced its concerns.

Plaintiffs allege that despite announcing its financial woes and suggesting that it would be unable to repurchase the May 2012 notes, CompuCredit nonetheless announced one month later in December 2009 that it was paying a cash dividend of about $24 million to CompuCredit shareholders. Plaintiffs contend that the dividend—allegedly the first dividend the company had ever paid—went primarily to David and Frank Hanna and other insiders as the majority shareholders.[3]

relief on May 12, 2010." [139, p. 2 n.1] Accordingly, the Court will dismiss without prejudice counts two and three of the complaint without further discussion and will only address below the portions of Defendants' motions to dismiss that pertain to the alleged UFTA violations.

**2.** Plaintiffs assert that the Hanna brothers together own 56.696 of CompuCredit's stock

and that they along with the other corporate insiders identified as Defendants own 61.6% of CompuCredit's stock.

**3.** In addition to deviating from the company's prior practice of not paying dividends, Plaintiffs allege that CompuCredit's conduct contradicted its statements just a month earlier in its November 10–Q that emphasized the company's desire to preserve capital.

CompuCredit also announced in November 2009 its intention to spin off Purpose financial Holdings, Inc. (the "FFH spin-off"), the microloan segment of its business. Plaintiffs contend the microloan segment is currently CompuCredit's only profitable business and that like the dividend, the spin-off will primarily benefit corporate insiders such as the Hanna brothers. Plaintiffs allege that CompuCredit has also filed a detailed Form 10 statement reflecting the proposed terms of the spin-off. That statement shows that current shareholders—again, primarily corporate insiders—will receive a ratable portion of the shares of the spun-off microloan subsidiary, meaning that the corporate insiders will own a majority of the shares of the subsidiary. The result of the PFH spin-off, Plaintiffs allege, will be the transfer of more than $140 million in equity away from CompuCredit, leaving the company with only deteriorating assets against which lenders will not lend credit.

Plaintiffs further contend that the November and December 2009 announcement resulted in the artificial suppression of the market price of the notes, which dropped to a level indicative of an insolvent company, and that CompuCredit then attempted to force Plaintiffs into selling back the notes at the artificially depressed prices. On January 28, 2010, CompuCredit initiated a tender offer for the notes at prices lower than that at which they had traded on December 2, 2009. Plaintiffs allege CompuCredit initiated another tender offer on April 14, 2010 for the 3.625% notes, and threatened noteholders that if they did not accept the offer in a sufficient volume, the funds would instead be spent on repurchasing shares of common stock at a 30% premium above market price (which would again benefit the corporate insiders who are the majority shareholders).

The noteholders allege that as a result of CompuCredit's actions, they have been left with a decision to either (1) tender their notes to CompuCredit at artificially depressed prices, or (2) retain the notes knowing that CompuCredit is intentionally rendering itself insolvent so that it will not have the ability to repurchase them at full value when they become due.

Plaintiffs contend that CompuCredit's conduct demonstrates a strategy of stripping its assets and transferring them to corporate insiders without receiving a reasonably equivalent value and thereby rendering the company unable to meet its obligations to creditors such as Plaintiffs. Such actions, Plaintiffs contend, constitutes fraudulent transfers under the UFTA.

In June 2010, CompuCredit and the other Defendants filed the pending motions to dismiss, arguing that Plaintiffs' UFTA claim should be dismissed because it (1) is contractually barred; (2) is not ripe for adjudication; (3) fails to state a prima facie case under the UFTA; (4) improperly seeks prospective relief; and (5) fails to comply with the heightened pleading standards for fraud allegations under Fed. R.Civ.P. 9(b).[4]

## II. Standard of Review

A complaint must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The allegations in Plaintiffs' com-

---

**4.** Defendants Rosencrants and Corona join the other Defendants' arguments in their entirety [134]. Defendants Hanna, Hanna, House, Gilbert, Srinivasan, and Whitehead join CompuCredit's arguments at sections I, III, and V[133].

plaint are presumed true at this stage, and all reasonable factual inferences must be construed in their favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994). However, "the court need not accept inferences drawn by [a] plaintiff if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v, MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994); *accord Lewis v. Brautigam*, 227 F.2d 124, 127 (5th Cir.1955).[5]

To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Only when the "plaintiffs have not nudged their claims across the line from conceivable to plausible" must the complaint be dismissed. *Id.* at 570, 127 S.Ct. 1955. *Twombly* makes clear that a plaintiff's obligation to state adequate grounds for relief under Fed. R.Civ.P. 8(a) "requires more than labels and conclusions." 550 U.S. at 555, 127 S.Ct. 1955, In further clarifying the *Twombly* standard, the Supreme Court has adopted a two-pronged approach to evaluating motions to dismiss; (1) eliminate any allegations in the complaint that are merely legal conclusions, and (2) where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1940–41, 173

L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

## III. Discussion

### A. Whether the Indentures Preclude Plaintiffs' Claims

### 1. Whether the Indentures Bar UFTA Claims Because They Contemplate the Transactions and Remedies at Issue

 Defendants contend that Plaintiffs' UFTA claim is barred by the terms of the indentures, which are essentially contracts that establish the noteholders' rights and CompuCredit's obligations under the notes.[6] Defendants contend that Plaintiffs did not negotiate for any financial covenant that would restrict the transfers at issue and that, to the contrary, the indentures expressly permit the transactions at issue. Defendants assert that the indentures required CompuCredit to notify the noteholders in advance of dividend payments and spin-offs such as those at issue in this case and to provide them with the right to convert all or a portion of their notes. Those who would elect to convert could receive cash and then purchase CompuCredit common stock and participate in any cash distribution or stock issuance. If they elected not to convert, the conversion rate on the notes would be adjusted ac-

---

5. The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981, *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

6. Copies of the indentures were not attached to the complaint. CompuCredit contends that because the complaint references and relies upon the indentures, the Court may examine and rely upon them for deciding the motions to dismiss without converting them to mo-

tions for summary judgment. Plaintiffs agree that the Court may consider on a motion to dismiss "all documents referenced in the complaint." [139 p. 4] The Court therefore will consider the contents of the indentures in ruling on the pending motions to dismiss. *See, e.g., Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir.2005) (document may be incorporated into complaint by reference and considered on a motion to dismiss without converting it to a motion for summary judgment).

cording to the indenture to offset the effect of the distribution. Defendants contend that although the April 2010 tender offer did not trigger conversion rights, it did cause a change to the conversion rate and that this contractual remedy was the only remedy that Plaintiffs were entitled to pursue. Because the indentures specifically address the transfers at issue and the relief afforded to the noteholders in the event of such transfers, Defendants argue, Plaintiffs have received all of the relief to which they are entitled. Defendants contend that Plaintiffs are attempting to bring a UFTA claim because they are unsatisfied with the bargain that they struck under the indentures.

In response, Plaintiffs contend that the contractual rights and remedies in the indentures do not eliminate the UFTA remedies because a contract does not bar fraudulent conveyance claims that are distinct from claims arising under the contract. Plaintiffs do not refute CompuCredit's assertions that the indentures expressly address (1) the transactions at issue, and (2) the remedies available to Plaintiffs in the event of such transactions. Instead, they argue that the express contractual rights and remedies do not eliminate the remedies provided for by UFTA because "a contract will not bar a fraudulent conveyance claim when that claim is distinct from claims arising under contract." [139, p. 23] [7] At issue, Plaintiffs assert, is whether CompuCredit's cash payment to shareholders and the proposed spin-off are fraudulent with respect to the noteholders—a question that does not involve the indenture. To hold otherwise, Plaintiffs assert, would mean that parties to an indenture agreement are not subject to the UFTA and may violate it with impunity.

Neither party has presented the Court with authority from any jurisdiction that directly addresses this issue. Defendants cite *Geren v. Quantum Chemical Corp.*, 832 F.Supp. 728 (S.D.N.Y.1993), a case in which bondholders sought damages caused by a corporation's distribution to its common stockholders of a special dividend that caused a substantial decline in the market value of the bonds. The indenture addressed the possibility of the company incurring additional debt and placed limits on its ability to take on additional secured indebtedness, but did not restrict the amount of debt that could be incurred or prohibit the dividend at issue. In dismissing the breach of duty of good faith and fair dealing claim, the court held, "if the challenged transaction does not violate any express term of the indenture, or prevent the bondholder from obtaining the benefit of an express indenture term, a bondholder may not challenge an action by the corporation on the basis of the indenture contract." *Id.* at 733. The court also dismissed the plaintiffs' fraudulent conveyance claim, pursuant to which they sought an award of damages representing the diminution in market value of the debt securities caused by the dividend. The court found that a fraudulent conveyance action did not allow for the recovery of a security debt's decline in market value. *Id.* at 736. The remedy available, the court found, was to "rescind the transfer, requiring transferee to return the transferred property to the transferor." *Id.* (also finding that the claim failed because it was not directed to a transferee or transferor of the assets, but against a third party who aided the transfer).

---

7. Plaintiffs also argue that they did not negotiate for the terms of the indenture. However, because Plaintiffs do not otherwise contest the indentures and base their right to have their notes repurchased upon the indentures, they have conceded that the indentures govern their contractual rights, regardless of whether the terms were subject to negotiation.

Although *Geren* might be useful in defining the outer perimeters of a UFTA claim brought by security debt holders, it is not applicable to this case because unlike the plaintiffs in *Geren,* Plaintiffs here seek the return of the $24 million dividend as well as an injunction against the PFH spin-off. Plaintiffs discuss the diminution of the market value of their notes, but it does not appear to the Court that Plaintiffs are (as Defendants argue) limiting their requested remedy to that of diminution in value. Plaintiffs want CompuCredit to retain the funds required to repurchase the notes when they became due, rather than intentionally depleting the company's assets to avoid that obligation and to allegedly enrich the corporate insiders who are the majority shareholders.[8] Thus, *Geren* does not support the proposition that the UFTA bars all suits by noteholders challenging transactions contemplated within an indenture as being fraudulent.

Similarly, Plaintiffs cite *Commercial Credit Group, Inc. v. Falcon Equipment, LLC,* No. 3:09–cv–376, 2010 WL 144101 (W.D.N.C. Jan. 8, 2010), for the proposition that Georgia's UFTA allows a fraudulent conveyance claim even where a viable breach of contract claim exists. The plaintiffs in *Falcon* brought a breach of contract claim for a deficiency judgment on the amounts remaining unpaid under a defaulted promissory note and a UFTA claim based on the defendants' sale of collateral previously pledged as security on the debt; the defendants were contractual-

ly prohibited from selling the collateral. *Id.* at *1–2. While analyzing whether to apply the law of Georgia (where the tort occurred) or Delaware (pursuant to a contractual choice-of-law provision), the court stated that because the "controversy actually concerns not the validity of the transfer, but whether that transfer was fraudulent [in relation to] Defendants, it is one of tort law, not contract law." *Id.* at *5. However, the defendants in that case apparently did not challenge whether the plaintiff could bring a UFTA claim addressing transfers that were permitted by contract, and the case does not discuss the matter in that context.[9]

▮ *Falcon* does make an important distinction, however, between the nature of a fraud claim and a contract claim. Merely because a party has a contract does not mean that it is entirely precluded from bringing a fraud claim; a potential problem arises only in situations where the fraud claim could have and should have been addressed through a breach of contract claim. Further, "in appropriate cases, conduct undertaken in the course of contract performance can constitute a fraud under Georgia law and may give rise to a cause of action for fraud independent of the parties' contract." *Integrated Pest Mgmt. Servs., LLC v. BellSouth Adver. & Publ'g. Corp.,* No. 1:04–cv–2880, 2005 WL 3096131, at *4 n. 3 (N.D.Ga. Nov. 16, 2005). At least one court applying Georgia law has found that "the fact that a fraudulent conveyance claim may arise out of a com-

---

8. *Geren* also does not appear to involve an allegation that the corporate directors transferred the assets at issue to themselves.

9. Both parties cite other cases in support of their positions, but those cases are more readily distinguishable than *Geren* or *Falcon,* and therefore the Court will not discuss them in detail. *See Leverso v. Southtrust Bank,* 18 F.3d 1527, 1531 (11th Cir.1994) (finding district court erred in approving class action

settlement that distributed assets in a manner contrary to indenture because "the terms of the indenture govern the parties' contractual rights"; the case does not discuss fraudulent conveyances); *Network Enter., Inc. v. APBA Offshore Prods., Inc.,* No. 01–cv–11765, 2002 WL 31050846, at *6–7 (S.D.N.Y., Sept. 10, 2002) (inapplicable because the transfer of assets was not contemplated by the contract or intertwined with the contract claim).

mon set of facts in which the elements of a breach of contract claim might also exist does not prevent ... pleading both claims in his complaint." *In re Friedman's Inc. v. Ernst & Young, LLP,* 372 B.R. 530, 546 (Bankr.S.D.Ga.2007) (finding that arbitration clause did not bar trustee's UFTA claim).

Accepting, as the Court must on a motion to dismiss, that the allegations in Plaintiffs' complaint are true, the Court cannot say that a potential contract claim would be impermissibly intertwined with Plaintiffs' UFTA claim. Although Plaintiffs are ultimately seeking to enforce rights granted by the indenture, their UFTA claim depends on facts and circumstances outside of any contractual rights or obligations provided by the indenture; it turns on Defendants' intentions behind the transfer, regardless of whether the transfers were facially valid. Accordingly, the Court finds that in this situation—where Plaintiffs allege that corporate insiders are transferring assets to themselves with the intention of rendering the company unable to repurchase Plaintiffs' notes—the indenture does not bar Plaintiffs' UFTA claim.

## 2. Whether the Indentures Bar the UFTA Claim Because Plaintiffs Failed to Comply with the No–Action Clause

■ Although Plaintiffs are not barred from bringing a UFTA claim merely because the claim relates to their rights under the indentures, the question remains as to whether Plaintiffs complied with the indentures' restriction on how they may bring such claims. Defendants argue that section 6.06 of the indentures (the "no-action clause") bars this litigation because Plaintiffs have not complied with its conditions precedent to any noteholder action.

Paragraph 6.06 of the "3.625% Convertible Senior Notes Due 2025 Indenture," dated May 27, 2005, [20–1] contains the following clause: [10]

*Limitation on Suits.* A Securityholder may not pursue any remedy with respect to this Indenture or the Securities, except in case of a Default due to the non-payment of the principal amount of the Securities, any accrued and unpaid Interest, any accrued and unpaid Contingent Interest, if any, or any accrued and unpaid Liquidated Damages, if any, unless:

(a) the Holder gives to the Trustee written notice stating that a Default is continuing;

(b) the Holders of at least 25% in aggregate principal amount of the Securities at the time outstanding make a written request to the Trustee to pursue the remedy;

(c) such Holder or Holders offer reasonable security or indemnity to the Trustee against any costs, liability or expense;

(d) the Trustee does not comply with the request within 60 days after receipt of such notice and offer of security or indemnity; and

(e) the Holders of a majority in aggregate principal amount of the Securities at the time outstanding do not give the Trustee a direction inconsistent with the request during such 60–day period.

A Securityholder may not use this Indenture to prejudice the rights of any other Securityholder or to obtain a preference or priority over any other Securityholder.

Defendants argue that because Plaintiffs have not alleged default, they are bound by the no-action clause and that their fail-

---

**10.** The indenture for the "5.875% Convertible Senior Notes Due 2035," dated November 23, 2005, § 6.06, contains identical language [20–1].

ure to comply therewith bars their suit, including their UFTA claim.

In response, Plaintiffs do not contend that they complied with the no-action clause. Instead, they argue that the no-action clause does not preclude this litigation for three reasons. First, they assert that no-action clauses are strictly construed and intended to protect noteholders against poor judgment by a single noteholder bringing suit outside of the collective best interest, and that here a majority of the noteholders have joined the suit. Second, they maintain that CompuCredit's own actions made compliance with the clause impossible, According to Plaintiffs, the December 21, 2009 filing of their lawsuit was triggered by CompuCredit's December 3, 2009 announcement that it would pay a dividend on December 31, 2009. Thus, they argue, it was not practical for noteholders to comply with the clause by notifying a trustee and waiting sixty days for a decision. The clause cannot be enforced, they argue, when the issuer's own actions make compliance impractical. Third, they argue, the no-action clause only applies to situations where bondholders are asserting the existence of a default, which is not the case here.

Courts applying New York law, which governs the indentures, have found that no-action clauses bar fraudulent conveyance claims.[11] *See Victor v. Riklis,* No. 91–CV–2897, 1992 WL 122911, at *6 (S.D.N.Y. May 15, 1992) (no-action clause prohibited fraudulent conveyance claim); *see also Peak Partners, LP v. Republic Bank,* 191 Fed.Appx. 118, 126–27 (3d Cir. 2006) (rejecting argument that no-action clause did not apply to fraud claims because "individual suits should be dismissed 'no matter whom the [noteholders] sue,' as long as 'the suits to be dismissed seek to enforce rights shared ratably by all [noteholders].'"); *Lange v. Citibank, N.A.,* No. 19245, 2002 WL 2005728, at *1 (Del.Ch. June 14, 2002) (applying New York law and dismissing fraudulent conveyance claim for not following contractually mandated pre-suit procedures); *Feldbaum v. McCrory Corp.,* Nos. 11866, 11920, 12006, 1992 WL 119095, at *8 (Del.Ch. June 2, 1992) (applying New York law to dismiss fraudulent conveyance claims for failure to comply with no-action clause).

The Eleventh Circuit has also recognized that no-action clauses "have generally been upheld by the courts in order to avoid a multiplicity of lawsuits and ensure that any litigation will inure for the equal and ratable benefit of all bondholders." *Murray v. U.S. Bank Trust Nat'l Assoc.,* 365 F.3d 1284, 1289 n. 9 (11th Cir.2004).

However, this Court has recognized exceptions to the application of a no-action clause under New York law. In *Whitebox Convertible Arbitrage Partners, L.P. v. World Airways, Inc.,* No. 1:04–cv–1350–RLV, 2006 WL 358270, at *4–8 (N.D.Ga. Feb. 15, 2006), bondholders sued a bond issuer for breaching the redemption provisions of an indenture agreement, and the issuer contended that the no-action clause barred the bondholders from bringing the action. The Court disagreed, holding that no-action clauses should be strictly construed and that the purpose of such clauses is to protect issuers and bondholders

> from the expense involved in defending lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors ..., They protect against the exercise of poor judgment by a ... small group of

---

11. Although the parties cite cases from multiple jurisdictions, Plaintiffs do not dispute Defendants' contention that New York law applies to the interpretation and application of the indentures. Further, § 12.09 of the indentures states that they are to be governed by and construed in accordance with New York law.

bondholders, who might otherwise bring a suit ... that most bondholders would consider not to be in their collective interest.

*Id.* at *4 (applying New York law). In *Whitebox*, the Court did not enforce the no-action clause, finding it generally inapplicable in wrongful redemption suits. The Court also found that the issuer's own actions made compliance impossible; the no-action clause required a sixty-day waiting period, but the challenged redemption was scheduled to occur in less than a month. *Id.*

Plaintiffs rely upon *Whitebox* in arguing that the no-action clause does not bar their suit because they represent the holders of a majority of the notes and they are instituting this action to protect the rights of all noteholders and other creditors of CompuCredit. Therefore, they argue, this is not the type of suit the no-action clause was intended to prevent.

Defendants reply that Plaintiffs are seeking damages for the diminution of the value of their notes, and therefore they do not represent the interests of all noteholders. The Court rejects this argument, as it is evident from the complaint that Plaintiffs are seeking to restore the transferred assets to CompuCredit, and not merely to recover the lost value of their notes. Moreover, the no-action clause requires that the holders of at least twenty-five percent of the aggregate principal amount of the notes make a written request to the trustee to pursue a remedy, but then provides the holders of "a majority in aggregate principal amount" of the notes with an opportunity to oppose or redirect the pursuit of that remedy. Thus, under the no-action clause, Plaintiffs—representing the majority of the noteholders—encompass both the twenty-five percent of noteholders initially required to pursue a remedy and the majority of noteholders that have power to veto the manner in which

the remedy is pursued. In other words, the purpose of the no-action clause has already been fulfilled in that there is no risk that a majority of the noteholders will be subject to the poor judgment of a minority of the noteholders.

Plaintiffs also rely upon *Whitebox* in arguing that they did not have to comply with the no-action clause because CompuCredit's own actions made compliance impossible. Plaintiffs argue that because CompuCredit announced on December 3, 2009, that it intended to pay a dividend on December 31, 2009, it was not practical for the noteholders to notify the trustee and wait sixty days for a decision.

In response, Defendants argue that the no-action clause would not necessarily have created a delay because it would not have prevented the indenture trustee from taking immediate action if it concluded that doing so was appropriate and in the interest of all noteholders and if Plaintiffs, as the majority noteholders, did not object. Defendants argue that the sixty-day waiting requirement is intended to provide the majority noteholders with an opportunity to object to the trustee's actions and that Plaintiffs, as the majority noteholders, would not have objected to the indenture trustee taking immediate action and waiving the sixty-day waiting period. However, the no-action clause does not contain a provision excluding the sixty-day waiting period, regardless of the majority's preference, and thus Defendants' proposed reading of the clause is not justified. Accordingly, the Court agrees that, as in *Whitebox*, it was not practical for the noteholders to wait sixty days before initiating litigation.

Plaintiffs also argue that the no-action clause does not bar this action because it only applies to situations where the noteholders are asserting the existence of a default. They base this argument on *Metropolitan West Asset Management, L.L.C.*

*v. Magnus Funding, Ltd.*, No. 03–Civ.–5539, 2004 WL 1444868, at *4–5 (S.D.N.Y. June 24, 2004), in which the court held that a no-action clause requiring written notice of an "Event of Default" applied by its terms only to claims relating to a default, and therefore did not prevent the plaintiffs from bringing extra-contractual tort claims. Defendants reply that the no-action clause at issue in *Metro West* differed from the one here because that clause applied only to claims arising out of payment default under the notes, whereas the clause here expressly does not apply to payment defaults.

The no-action clause states that the noteholders "may not pursue any remedy with respect to this Indenture or the Securities, except in case of a Default due to the non-payment of the principal amount of the Securities, any accrued and unpaid Interest, any accrued and unpaid Contingent Interest, if any, or any accrued and unpaid Liquidated Damages, if any" unless they comply with the no-action clause and act through the trustee. However, the no-action clause also contains the mandatory requirement that the noteholders give "the Trustee written notice stating that a Default is continuing." Thus, noteholders may pursue an action through the trustee only by giving notice of default and may pursue individual action only in the event of default; the no-action clause makes no provision for non-default claims, Because no default has yet occurred, it is difficult to fathom how the noteholders could pursue their UFTA claim while also complying with the no-action clause. Accordingly, the Court agrees with the holding in *Whitebox* and finds that under these circumstances Plaintiffs' UFTA claim is not barred by the no-action clause.

## B. Whether Plaintiffs State a Claim Under the UFTA

Defendants contend that even if this action is not barred by the indentures, Plaintiffs' UFTA claim fails because it is not ripe for adjudication and because Plaintiffs cannot state a prima facie case of either actual or constructive fraud.

### 1. Whether Plaintiffs' UFTA Claim Is Ripe

█ Defendants first argue that unless and until CompuCredit fails to meet some obligation to Plaintiffs, which allegedly has not occurred, Plaintiffs' UFTA claim is speculative and based upon conjecture and therefore should be dismissed because it is not ripe for adjudication.

The UFTA defines "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." O.C.G.A. § 18–2–71(3). As the Eleventh Circuit has observed, this definition is extremely broad. *Dillon v. Axxsys Int'l, Inc.*, 185 Fed.Appx. 823, 830 (11th Cir.2006). Further, a creditor may seek relief for a fraudulent transfer regardless of whether his claim arises before or after the challenged transfer. *Miller v. Lomax*, 266 Ga.App. 93, 102–03, 596 S.E.2d 232, 242 (2004); O.C.G.A. § 18–2–74(a).

According to CompuCredit, Plaintiffs' UFTA claim is based on speculation about events that allegedly may occur when the notes become redeemable, such as (1) the terms of the PFH spin-off; (2) whether the 2025 notes will be outstanding in May 2012; (3) whether Plaintiffs will continue to own their 2025 notes until May 2012; (4) whether Plaintiffs holding the 2025 notes will require CompuCredit to purchase their 2025 notes in 2012; (5) whether CompuCredit will be unable to purchase the 2025 notes; and (6) if CompuCredit proves unable to pay, whether the inability to purchase the 2025 notes will result from conduct alleged in the complaint. CompuCredit argues that it would also be prema-

ture for the Court to consider the PFH spin-off because it has not yet been recommended to CompuCredit's board and its terms will not be known unless and until the board approves the transaction. In addition, it contends that Plaintiffs' UFTA claim is not ripe because they have not incurred any damages.

In response, Plaintiffs contend that the dispute is not abstract, but an ongoing course of conduct that has occurred in part and is threatened in part. Plaintiffs argue that the conduct has adversely affected the market price of the notes, which Compu-Credit is exploiting by attempting to buy the notes at an undervalued price under the threat of being insolvent when the notes become due. Plaintiffs further assert that the record is sufficiently developed regarding the potential spin-off because CompuCredit has addressed the terms for the PFH spin-off in detail in its SEC Form 10 filing and amendments.

In reply, Defendants argue that Plaintiffs' response contains no allegation that CompuCredit has missed any payments to Plaintiffs or breached any obligation under the indentures. Further, they assert that Plaintiffs' argument regarding the diminution in value of their notes fails because the UFTA provides no protection against decreases in the market value of debt held by creditors. Defendants contend that holders of corporate debt securities such as Plaintiffs have no rights to have the market value of such debt unimpaired as long as they are paid interests and principal when due. According to Defendants, allowing Plaintiffs to proceed on their claims with no allegation of delinquent payments or of breached indentures would "open up a pandora's box of litigation sub-

jecting every corporate transaction that adversely affects the market value of debt securities to UFTA claims." [146, p. 8]

■ In Georgia, the cardinal rule for the construction of statutes is to ascertain the intent of the General Assembly and the purpose in enacting the law, O.C.G.A. § 1–3–1. Legislative intent must be determined from a consideration of the statute as a whole. *Bd. of Trs. v. Christy*, 246 Ga. 553, 554, 272 S.E.2d 288, 290 (1980), *overruled on other grounds, Mayor & Alderman of Savannah v. Stevens*, 278 Ga. 166, 167–68, 598 S.E.2d 456, 458 (2004). When construing a state statute, no part should be "read out" as "mere surplusage" unless there is a clear reason for doing so. *Porter v. Food Giant, Inc.*, 198 Ga.App. 736, 738, 402 S.E.2d 766, 768 (1991). All words are to be given their ordinary meaning. O.C.G.A. § 1–3–1; *State v. Davis*, 246 Ga. 761, 761, 272 S.E.2d 721, 722 (1980). Further, when statutory language "is plain and unequivocal, judicial construction is not only unnecessary but is forbidden," *City of Jesup v. Bennett*, 226 Ga. 606, 609, 176 S.E.2d 81, 83 (1970).

Applying these rules, it seems evident that the statute precludes the type of ripeness argument that Defendants assert. Defendants provide a list of contingencies that may affect whether Plaintiffs will actually be damaged by CompuCredit's failure to meet its obligations under the notes. However, Defendants have not identified any provision within the UFTA requiring a creditor's claim to be "ripe," and the cases they cite addressing ripeness and speculation do not involve UFTA claims.[12] Further, the language of the statute itself articulates that creditors have viable

---

12. The eases Defendants cite do not pertain to UFTA. *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir.2001) (not addressing UFTA); *In re IAC/InterActive Corp.*, 948 A.2d 471, 491 (Del. Ch.2008) (same); *Pendley Quality Trailer Sup-*

*ply, Inc. v. B & F Plastics, Inc.*, 260 Ga.App. 125, 126, 578 S.E.2d 915, 918 (2003) (same). Thus, these cases provide little guidance in interpreting and applying the UFTA.

claims under the UFTA even where the obligation has not matured and may be contingent upon other happenings.

The UFTA's definitions of "creditor" and "claim" encompass persons who have "a right to payment, whether or not the right is ... fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." CompuCredit does not dispute that Plaintiffs have a right to payment, but they essentially argue that Plaintiffs cannot take steps under the UFTA to protect that right unless CompuCredit has "missed a payment" or "breached an obligation"—regardless of whether the corporation currently may be rendering itself insolvent through insider transfers so that it will ultimately be unable repurchase the notes at full value when they become due. Reaching this conclusion would require the Court to disregard the plain language of the UFTA that expressly encompasses claims that are unmatured and contingent.

Further, at least two other courts addressing this issue under comparable circumstances have found that ripeness is not a requirement under the UFTA due to the broad statutory language defining "creditor" and "claim." *Kipperman v. Onex Corp.*, 411 B.R. 805, 832 n. 22 (N.D.Ga. 2009) (rejecting argument that the plaintiff could not be a creditor without a ripe claim); *see also Ford Motor Credit Co. v. Chiorazzo*, 529 F.Supp.2d 535, 540 (D.N.J. 2008) (rejecting defendant's ripeness defense under New Jersey's UFTA because "[d]etermining whether a particular transfer is fraudulent only requires a court to answer two questions: whether the debtor has placed some asset beyond the reach of its creditor which would have been available to it at some point in time but for the

conveyance; and whether the debtor has transferred property with an intent to defraud, delay, or hinder the creditor."). Therefore, the Court rejects Defendants' argument that Plaintiffs' UFTA claim must be dismissed for want of ripeness.

## 2. Whether Plaintiffs Sufficiently Allege Actual Fraud Under the UFTA

To show actual fraud under the UFTA, Plaintiffs must show that (1) they are the Defendants' creditors;[13] (2) Defendants made a transfer or incurred an obligation; and (3) Defendants did so with the actual intent to hinder, delay or defraud Plaintiffs. O.C.G.A. § 18–2–74(a)(1).

### a. Whether Defendants Made a Transfer or Incurred an Obligation

The UFTA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance." O.C.G.A. § 18–2–71(12). "Asset" is defined as the property of the debtor, not including property encumbered by a valid lien, exempt under bankruptcy law, or held in tenancy by the entirety. O.C.G.A. § 18–2–71(2), "Property" is defined as "anything that may be the subject of ownership." O.C.G.A. § 18–2–71(10), The UFTA further provides that a transfer is made when it is "so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under this article that is superior to the interest of the transferee," O.C.G.A. § 18–2–76(1)(B), and "a transfer is not made until the debtor has acquired rights in the asset transferred,"

---

13. Defendants do not directly dispute that Plaintiffs are creditors. The UFTA defines a creditor as "a person who has a claim." O.C.G.A. § 18–2–71(4), As discussed above.

Plaintiff have brought "claims" pursuant to the UFTA. Thus, the Court finds that Plaintiffs are creditors under the UFTA.

O.C.G.A. § 18–2–76(4), Further, "an obligation is incurred" when effective by oral agreement or by execution of a written agreement, O.C.G.A. § 18–2–76(5). Thus, the relevant inquiry is not whether a transfer has occurred, but whether the obligation to make the transfer has been incurred. *See Kipperman v. Onex Corp.,* 411 B.R. 805, 834 (regarding determination of statute of limitations).[14]

■ Plaintiffs contend that the following CompuCredit transactions are "transfers" under the UFTA: (1) December 23, 2009 dividend of $24 million to shareholders; (2) the May 2010 coercive tender offer in which $85 million of shares were purchased at an alleged premium; and (3) the proposed PFH spin-off. Defendants do not appear to contest that the dividend and the stock purchase were "transfers" (although they dispute the applicability of the UFTA to these transfers in other ways). It seems evident that both of these transactions involved CompuCredit parting with the asset of money and therefore constitute transfers that may be challenged under the UFTA.

■ Defendants argue, however, that the PFH spin-off is not a transfer under the UFTA because it has not yet occurred. The Court agrees that pursuant to the UFTA, the PHF spin-off is not a transfer because it has not yet taken place and because CompuCredit has incurred no obligation with regard to it. However, the question remains as to whether enjoining the PHF spin-off is a remedy available to Plaintiffs under the UFTA, should they otherwise prevail in establishing that the December 2009 dividend and the May 2010 tender offer were fraudulent transfers. The Court will address that issue below.

### b. Whether Defendants Intended to Hinder, Delay or Defraud Plaintiffs

■ Plaintiffs contend that CompuCredit undertook the December 2009 dividend payment and the May 2010 tender offer with the intention of hindering, delaying or defrauding them as creditors. In analyzing whether Plaintiffs had "actual" intent to defraud, the Court may consider whether (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or the obligation was disclosed or concealed; (4) before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor, O.C.G.A. § 18–2–74(b).

■ These factors are often referred to as "badges of fraud," and they focus on the debtor's state of mind. Courts have not delineated a single formula required to show intent through badges of fraud; instead, it is a case-by-case determination, and fraudulent intent may be inferred from the totality of the circumstances,

---

**14.** This language within the UFTA also supports the Court's finding regarding ripeness because it shows that the relevant temporal inquiry is not when the obligation becomes due, but when the fraudulent transfer takes place.

*Tindall v. H & S Homes, LLC*, No. 5:10–cv–044, 2011 WL 65932, at *6 (M.D.Ga. Jan. 10, 2011). Further, the statute does not require Plaintiffs to show that Defendants intended to make CompuCredit insolvent, but merely that they intended to hinder Plaintiffs' ability to recover the value of their notes. O.C.G.A. § 18–2–74(a)(1); *see also Kipperman,* 411 B.R. at 829.

Plaintiffs assert that the tender offer is but one event in a series of events that demonstrate CompuCredit's actual intent to defraud its creditors and contend that the following actions should be considered badges of fraud: (1) each of the transfers is for the benefit of the shareholders of CompuCredit, primarily composed of corporate insiders, and at the expense of CompuCredit's creditors; (2) CompuCredit is not receiving reasonably equivalent value in return for its transfers; (3) the transfers depart from CompuCredit's stated policies of preserving capital and not paying dividends, as well as reasonably acceptable business practices; and (4) CompuCredit is in dire financial straits such that it will likely be insolvent before the notes are due and is already insolvent on a pro forma basis.

Plaintiffs allege that CompuCredit's pattern of transferring half of its capital assets to corporate insiders during a time when the company "is bleeding money" [139, p. 31] and has publicly expressed doubts about its ability to satisfy the $231 million principal payment due in 2012 demonstrates its intention of hindering Plaintiffs from recovering the full value of their notes. Further, they argue, CompuCredit's plan to provide insiders with its only profitable subsidiary further demonstrates its intention to render itself unable to satisfy its obligations to Plaintiffs.

In response, Defendants argue that Plaintiffs have not sufficiently alleged intent to defraud because (1) CompuCredit has missed no payments to Plaintiffs; (2) Plaintiffs concede CompuCredit is solvent; (3) CompuCredit was not obligated to obtain equivalent value from its distributions to shareholders; (4) distributions to insiders who own stock in accordance with their stock ownership is not indicative of fraud; (5) the public disclosure of its transfers weighs against a finding of fraud; and (6) its efforts to repurchase the notes at discounted rates shows good faith and not fraud.

 As discussed above, Defendants have not identified any provision of the UFTA that would excuse a fraudulent transfer because a debtor is not yet delinquent on payments to its creditors. Likewise, the UFTA does not require a creditor to wait until a debtor is insolvent before seeking relief from fraudulent transfers.[15] Neither of those considerations would be grounds for dismissing the complaint.

 Further, the UFTA does not require that the transfer itself be illegal; the issue is whether the intention behind the transfer was to defraud creditors. Defendants suggest that the transfers could not be illegal because they complied with the Title 14 of the Georgia Code (Corporations, Partnerships, and Associations) or are otherwise legal on their face; but such an argument does not answer the relevant

---

**15.** Plaintiffs do not have to establish insolvency as a prerequisite to an actual-fraud UFTA claim; insolvency is but one of the badges of fraud that may be considered. Depending upon the evidence that Plaintiffs develop during discovery, showing that CompuCredit is insolvent on a pro forma basis (rather than under generally accepted accounting principles) may be sufficient to establish insolvency as a badge of fraud because the "the book value of [a] company's assets does not control for purposes of insolvency." *Kipperman,* 411 B.R. at 836.

question of *why* Defendants made the transfers and whether their intention was to defraud creditors. Likewise, the fact that the transfers were publicly announced does not render them incapable of being fraudulent. Although concealment would have been a factor weighing on the side of fraud, it is unlikely that a publicly traded corporation could have easily concealed transfers of this nature even if it wished to do so. Moreover, Plaintiffs allege that the public disclosure was by design as part of Defendants' scheme to defraud Plaintiffs by artificially suppressing the value of their notes and forcing them to accept less than the full value or risk receiving nothing if CompuCredit becomes insolvent. Thus, the lack of concealment is not as significant in this case as it might be in another.

Similarly, Defendants contend that "it is black-letter law that the directors and officers of a solvent corporation, such as CompuCredit, owe their duties to the shareholders of the corporation and that they must take actions that, in their business judgment, will maximize shareholder value." [146 p. 19] However, Defendants have not shown that maximizing shareholder value and defrauding noteholders are mutually exclusive actions. Likewise, the Court is not prepared to dismiss a complaint on Defendants' apparent contention that a corporation's transfers to its shareholders can never be fraudulent, even where the shareholders receiving the transfers are primarily comprised of corporate insiders. This is particularly true considering that transfers to insiders is one of the most important indicators of fraud. *See Kipperman v. Onex Corp.,* Civ. Action No. 1:05–cv–1242–JOF, 2007 WL 2872463, at *9 (N.D.Ga. Sept. 26, 2007);

*see also In re Toy King Distribs., Inc.,* 256 B.R. 1, 126 (Bankr.M.D.Fla.2000); *Brown v. Cooper,* 237 Ga.App. 348, 353, 514 S.E.2d 857, 862 (1999) (finding that transactions where one person is on both sides should be scrutinized more closely), At a minimum, Plaintiffs have alleged sufficient indicators of fraudulent intent to avoid dismissal on this basis.

### C. Whether Plaintiffs Sufficiently Allege Constructive Fraud Under the UFTA

 In addition to alleging actual fraud, Plaintiffs aver that the transfers at issue were constructively fraudulent. To state a prima facie case of constructive fraud, Plaintiffs must show that CompuCredit (1) made a transfer or incurred an obligation (2) without "receiving a reasonably equivalent value in exchange for the transfer or obligation," and (3) either:

(a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction (O.C.G.A. § 18–2–74(a)(2)(A));

(b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due (O.C.G.A. § 18–2–74(a)(2)(B)); [16] or

(c) was insolvent at that time or became insolvent as a result of the transfer (O.C.G.A. § 18–2–75(a)).[17]

As opposed to actual fraud, which focuses on the debtor's state of mind, constructive fraud focuses on the debtor's financial condition, Plaintiffs have sufficiently alleged the first two factors of constructive fraud for the reasons already discussed,

---

**16.** O.C.G.A. § 18–2–74(a)(2)(A)(B) applies to claims regardless of whether they arise before or after the transfer was made.

**17.** O.C.G.A. § 18–2–75(a) requires showing that the plaintiff's claim arose before the transfer was made.

Further, Plaintiffs have pled that Compu-Credit (1) is in extreme economic distress that is rapidly worsening; (2) is insolvent on a pro forma balance sheet basis and probably unable to pay future debts; (3) expressed doubt about its ability to pay future obligations before the asset transfers at issue; (4) has transferred a significant amount of assets and equity to insiders through a $24 million cash distribution to shareholders and the stock purchase through the April 2010 tender offer; and (5) plans to spin-off PFH, which represents almost all of its remaining equity. Thus, Plaintiffs have alleged that Compu-Credit became insolvent on a pro forma basis as a result of its transfers and is about to engage in a transaction—the proposed PHF spin-off—or which its remaining assets are unreasonably small in relation to the business or transaction.

In response, Defendants contend that Plaintiffs' " 'sky is falling' allegations" have no basis in fact and therefore must be dismissed. Defendants dispute many of Plaintiffs' allegations, including Plaintiffs' allegation that PFH is the only profitable segment of the business, However, factual disputes of this nature are not appropriate considerations on a motion to dismiss. The allegations in Plaintiffs' complaint are presumed true at this stage, and all reasonable factual inferences must be construed in their favor. *Hunnings*, 29 F.3d at 1484. Here, accepting Plaintiffs allegations as true, they have at a minimum stated a prima facie case of constructive fraud under the UFTA.

### D. Whether Plaintiffs Have Shown Harm

The parties dispute whether Plaintiffs must show harm under the UFTA. The statute itself discusses available remedies, but does not expressly impose a requirement that Plaintiffs allege damages as part of their prima facie case.

At least one other court considering this issue has found that harmful intent is not sufficient to establish a fraudulent conveyance; the plaintiff must also demonstrate "some injury flowing from the wrongful conduct." *Lippe v. Bairnco Co.*, 249 F.Supp.2d 357, 375 (S.D.N.Y.2003) (analyzing whether damages were required to show actual fraud under § 276 of the New York Debtor and Creditor law). Establishing harm, however, would not require Plaintiffs to show that CompuCredit is insolvent or that CompuCredit has in fact failed to meet some contractual obligation. Instead, such harm may consist of a diminution in "the value of the assets of the debtor's estate remaining available to creditors." *Lippe*, 249 F.Supp.2d at 375. Here, Plaintiffs allege that the two transfers at issue diminished CompuCredit's remaining assets and made it unlikely that CompuCredit will be able to meet its obligations to them. That allegation and the allegations of fraud already discussed are sufficient to survive a motion to dismiss.

Defendants also contend that Plaintiffs "admit" that their only claimed injury is the presently diminished value of their notes. The Court does not read Plaintiffs' allegations so narrowly because they have repeatedly referenced the general depletion of CompuCredit's assets and the threat that CompuCredit will be unable to repurchase the notes when they come due. Thus, this is not a case where the creditor seeks damages solely on the present diminution in the market value of its debt securities. Defendants also rely upon *Fox v. MGM Grand Hotels, Inc.*, 137 Cal. App.3d 524, 527, 187 Cal.Rptr. 141 (Cal. App.2d Dist.1982), which held that an unsecured creditor "has no enforceable right to have the market value of his debt unimpaired, so long as he is paid interest and principal when due." However, that case also explains that a creditor "does have a right not to have the debtor deliberately act for the purpose of impairing

the creditor's legitimate business expectations ... that the debt, with interest, will be paid when due." Here, Plaintiffs have alleged that Defendants are intentionally impairing their expectation that the notes will be repurchased when due, which is sufficient to survive a motion to dismiss under the UFTA.[18]

### E. Whether Plaintiffs May Seek Prospective Relief Under the UFTA

· Defendants contend that the UFTA does not permit the Court to enjoin the proposed PFH spin-off. They argue that such prospective relief is unavailable under the UFTA and that Plaintiffs have not identified a single case in which a court has granted an injunction under the UFTA. They contend that because the statute allows for the avoidance of transfers even after they are complete, the UFTA permits only retrospective relief except in limited circumstances related to the further disposition of assets that have already been transferred.

■■■ As discussed above, the Court agrees that the PFH spin-off cannot be considered a transfer under the UFTA because it has not yet occurred. However, the Court reads the UFTA more broadly than Defendants with regard to whether Plaintiffs may seek to enjoin the PFH spin-off. In an action for relief under the UFTA, a plaintiff may obtain "[a]n injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property." O.C.G.A. § 18–2–77(a)(3)(A). Defendants argue that this language means the Court may only enjoin "further disposition" of "the asset transferred." However, the statute also states that the Court may enjoin further disposition of the debtor's "other property." The Court understands this to mean that the UFTA permits enjoining not only the further transfer of the already-transferred asset by the transferee, but also the transfer of "other assets" by the debtor. To read it any other way would render meaningless its application to "the debtor or transferee, or both." Further, the UFTA permits the Court to award "[a]ny other relief the circumstances may require." O.C.G.A. § 18–2–77(a)(3)(C). Defendants have given the Court no reason to assume that the statute actually means "any other relief" *except* for an injunction. Therefore, Plaintiffs may pursue an injunction against the PFH spin-off if they otherwise prevail in establishing that the December 2009 dividend and the May 2010 tender offer were fraudulent transfers.

Accordingly, the Court finds that the UFTA permits the type of claim that Plaintiffs have brought. Considering the complaint as a whole, the Court concludes that it both alleges the requisite statutory elements and marshals "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. Defendants assert that "Plaintiffs' UFTA claim should be dismissed because, after seven months and hundreds of pages of briefing, Plaintiffs still have not identified a single case allowing a UFTA claim to proceed in circumstances even remotely similar to those present here— *i.e.*, a claim by a creditor that has been paid all amounts currently owed to it." [146 p. 18] By that same reasoning, however, Defendants have not identified a case where claims substantially similar to those at issue here (involving allegations of fraudulent transfers to corporate insiders through dividend payments and other

---

18. Moreover, *Fox* was not a UFTA case. As discussed above, UFTA contains language encompassing contingent and unmatured claims that by their very nature may not have yet resulted in actual loss. Therefore, non-UFTA cases finding that a plaintiff must have suffered an actual loss to state a fraudulent transfer claim are not controlling.

**1336**

means intended to avoid obligations to noteholders) were *not* permitted under the UFTA.

Defendants bear the burden on their motions to dismiss. In sum, even though they argue that this is not the kind of case to which the UFTA should apply, they have not given the Court good reason to discount the language in the UFTA that appears to encompass Plaintiffs' claim.

### F. Whether Complaint Meets Rule 9(b)'s Heightened Pleading Requirements for Fraud Claims

■ In addition to joining the arguments brought by CompuCredit, Defendants David Hanna, Frank Hanna, House, Gilbert, Srinivasan and Whitehead allege that the complaint fails to provide sufficient factual allegations to support a fraud claim. Defendants argue that there are no factual allegations that name any individual defendant or connect an individual defendant with a specifically alleged fraudulent transfer. Defendants contend that where a complaint alleges fraud against multiple defendants, it must distinguish among defendants and their specific roles.

Plaintiffs respond that they have adequately pled intentional fraud under Rule 9(b) in that they have alerted each Defendant to the fraudulent conduct of which they are being charged. Citing *Kipperman*, 2007 WL 2872463, at *6, Plaintiffs assert that they provided necessary allegations by pleading jurisdiction, indebtedness, the amount owed, and a statement of a fraudulent conveyance for the purposes of defrauding or hindering the collection of indebtedness. Plaintiffs contend that their detailed allegations of the circumstances demonstrating CompuCredit's intent to hinder, delay or defraud its creditors is sufficient to satisfy Rule 9(b), even if applicable to claims under the UFTA.

This Court has found that Rule 9(b) applies to the claims of "intentional" fraud

under O.C.G.A. § 18–2–74(a)(1) but not to claims of constructive fraud under O.C.G.A. § 18–2–74(a)(2). *Kipperman*, 2007 WL 2872463 at *6, Other courts within this circuit have determined that Rule 9(b)'s heightened pleading standard is inapplicable under the UFTA. *See Nesco, Inc. v. Cisco*, No. 205–142, 2005 WL 2493353, *3 (S.D.Ga. Oct. 7, 2005) (rejecting heightened pleading standard under Georgia's UFTA because common law fraud and UFTA claims "bear very little relation to each other" since the element of false representation need not be proven under the UFTA).

Without resolving what appears to be a conflict within this circuit regarding the pleading standard for UFTA claims, the Court finds that Plaintiffs have adequately alleged a UFTA violation, even under Rule 9(b)'s heightened pleading standard. There is no doubt here that Defendants have adequately been put on "notice as to the conduct complained of so that they have sufficient information to formulate a defense." *Kipperman*, 2007 WL 2872463 at *7 (internal quotation omitted). Accordingly, Defendants have not shown that Plaintiffs' claim should be dismissed on this basis.

### G. Whether Plaintiffs State a Claim Against the Directors Personally

Defendants Rosencrants and Corona contend that Plaintiffs have no cause of action under the UFTA against them as corporate directors. They argue that the UFTA creates no liability against directors for transfers made by a corporation because the corporation, and not its directors, made the transfer. Such a claim, they argue, is essentially one that the directors aided and abetted a fraudulent transfer, which they assert is not an available claim under the UFTA.

■ Plaintiffs respond that their claim against Rosencrants and Corona is not

based on their role as directors of CompuCredit, but on their role as recipients of the transferred assets. They argue that the UFTA clearly provides for the ability to recover improperly transferred assets.

The Court agrees with Plaintiffs. Among the remedies available, Plaintiffs would be entitled to an "attachment or other provisional remedy against the asset transferred or other property of the transferee" if they have otherwise established their UFTA claim, O.C.G.A. § 18–2–77. Plaintiffs allege that Rosencrants and Corona, as shareholders, were recipients of the transferred assets at issue. Therefore, Plaintiff may name them as Defendants in this litigation.

## IV. Conclusion

By Plaintiffs' consent, counts two and three of the complaint are DISMISSED without prejudice.

The Court DENIES Defendants' motions to dismiss [124, 133 and 134].