Glob. Textile All., Inc. v. TDI Worldwide, LLC, 2018 NCBC 54.

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

GLOBAL TEXTILE ALLIANCE, INC.,

Plaintiff,

v.

TDI WORLDWIDE, LLC; DOLVEN ENTERPRISES, INC.; TIMOTHY DOLAN, individually and in his capacity as an officer, shareholder and director of Dolven Enterprises, Inc. and an officer of TDI Worldwide, LLC; JAMES DOLAN, individually and in his capacity as an officer, shareholder and director of Dolven Enterprises, Inc.; STEVEN GRAVEN, individually and in his capacity as an officer, shareholder and director of Dolven Enterprises, Inc.; RYAN GRAVEN, individually and in his capacity as an officer, shareholder and director of Dolven Enterprises, Inc.; GARRETT GRAVEN, individually; GFY INDUSTRIES LIMITED; GFY, LIMITADA de CAPITAL VARIABLE; GFY COOPERATIVE, U.A.; and 上海冠沣源贸易有限公司 a/k/a GFY SH,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 7304

**ORDER AND OPINION ON DEFENDANT JAMES DOLAN'S MOTION TO DISMISS AMENDED COMPLAINT**

THIS MATTER comes before the Court on Defendant James Dolan's Motion to Dismiss Amended Complaint ("Second Motion to Dismiss"; ECF No. 156).

THE COURT, having considered the Second Motion to Dismiss, the briefs in support of and in opposition to the Second Motion to Dismiss, and other appropriate matters of record, concludes that the Second Motion to Dismiss should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

*Hagan Barrett & Langley PLLC, by J. Alexander S. Barrett and Kurt A. Seeber for Plaintiff Global Textile Alliance, Inc.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Eric M. David, Brian C. Fork, and Shepard D. O'Connell for Defendant James Dolan.*

*James, McElroy & Diehl, P.A., by Fred B. Monroe and Carl M. Short III for Defendants TDI Worldwide, LLC and Timothy Dolan.*

*K&L Gates LLP, by A. Lee Hogewood III, John R. Gardner, and Matthew T. Houston for Defendants Dolven Enterprises, Inc. and Ryan Graven.*

*Ellis & Winters LLP, by Jonathan A. Berkelhammer, Steven A. Scoggan, and Scottie Forbes Lee for Defendant Steven Graven.*

*Morningstar Law Group, by Shannon R. Joseph and Jeffrey L. Roether for Defendant Garrett Graven.*

McGuire, Judge.

## FACTUAL AND PROCEDURAL BACKGROUND

1. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. N.C.G.S. § 1A-1, Rule 12(b)(6) (hereinafter, the North Carolina Rules of Civil Procedure will be referred to as "Rule(s)"). The Court only recites those facts included in the Complaint that are relevant to the Court's determination of the Motion. *See, e.g.*, *Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).

2. Plaintiff Global Textile Alliance, Inc. ("Plaintiff") is a North Carolina corporation with its principal place of business in Rockingham County, North Carolina. Plaintiff is in the business of providing fabrics, mattress ticking, covers, and other textiles to the bedding, upholstery, and home furnishings industries.

3. Plaintiff was founded in 2001 by Luc Tack ("Tack"), a Belgian entrepreneur, and Defendants Timothy Dolan ("Timothy") and Steven Graven ("Steven"). Tack provided the funding to start Plaintiff, and Timothy incorporated Plaintiff and transferred all of its shares to Tack in the fall of 2001. (Am. Compl., ECF No. 149, at ¶ 21.) Since that time, Tack has been the sole shareholder of Plaintiff. (*Id.*) Until April 2016, Timothy served as Plaintiff's CEO and as a director, and Steven served as Plaintiff's Executive Vice President and as a director. (*Id.* at ¶¶ 4, 6.)

4. Defendant James Dolan ("James") is Timothy Dolan's brother and resides in Trabuco Canyon, California. James was never employed by Plaintiff.

5. Plaintiff's business is "highly competitive," and Plaintiff "build[s] and maintain[s] close relationships with customers, develop[s] products with them, and serv[es] their particular needs." (*Id.* at ¶ 24.) Plaintiff is familiar with each customer's requirements and needs, technical parameters, manufacturing standards and capabilities, and buying habits and volumes. (*Id.* at ¶ 26.)

6. Plaintiff uses third-party vendors to provide certain products and services integral to its manufacturing of its products. Plaintiff contracts with third-party fabric mills to manufacture some of its fabrics. Plaintiff also contracts with "cut-and-sew" operations to further process the fabric that Plaintiff manufactures into final products for its customers. Plaintiff uses an "extremely selective" process to identify qualified third parties, requiring significant amounts of time and money.

(*Id.* at ¶ 29.)  The third-party fabric mills and cut-and-sew operations are located primarily in China.

7.      In or around 2005, Plaintiff hired Defendant Ryan Graven ("Ryan"), Steven's son, to set up an office in China (known as "GTA Asia") and to serve as Plaintiff's Director of Asia Operations.  (*Id.* at ¶ 34.)  Ryan's job duties were to identify qualified and reliable Chinese fabric mills and cut-and-sew vendors for Plaintiff and to oversee the vendors' work for Plaintiff.  (*Id.* at ¶ 35.)  In 2012, Plaintiff hired Ryan's brother, Defendant Garrett Graven ("Garrett"), to replace Ryan as Director of Asia Operations, but Ryan continued to be employed by Plaintiff.  (*Id.* at ¶ 58.)  Through GTA Asia, Plaintiff invested "significant amounts of time and money" to identify, select, and develop relationships with Chinese vendors capable of providing high-quality, reliable products and services for Plaintiff.  (*Id.* at ¶¶ 40–41.)

8.      In his role as Plaintiff's CEO, Timothy served as head of GTA Asia's operations and oversaw the Director of Asia Operations position.  Through their positions with Plaintiff, Timothy and Ryan gained extensive and detailed knowledge about all aspects of Plaintiff's Asia operations and about the capabilities of Plaintiff's vendors.  (*Id.* at ¶¶ 37–43.)

9.      On or about May 4, 2009, Timothy, Steven, Ryan, and James founded GFY Industries Limited ("GFY"), a Chinese company, using Plaintiff's offices, employees, capital, and other assets.  (*Id.* at ¶¶ 46–47.).  Steven stated that GFY was created to provide "one company to manage cut-and-sew facilities, operations, logistics, quality control, and product in-flow and out flow."  (*Id.* at ¶ 48.)  Ryan stated

that he founded GFY to "manage the sourcing, quality and servicing of [cut-and-sew] products." (*Id.*) Plaintiff alleges that GFY "went into direct competition" with Plaintiff. (*Id.* at ¶ 49.)

10. GFY also bought fabric from Plaintiff, which GFY would then send to third-party cut-and-sew vendors to make products for Plaintiff's customers. (*Id.* at 52–53.) Plaintiff alleges that "[t]here was no reason that [Plaintiff] could not have directly sourced its fabrics to the third-party cut and sew operators, as it had done for many years." (*Id.* at ¶ 55.) Timothy, Steven, and Ryan did not disclose the creation of, or their ownership interests in, GFY to Tack.

11. In addition to contracting with cut-and-sew operators in China, in 2011, Plaintiff began its own cut-and-sew operation in Reidsville, North Carolina.

12. In August 2013, Timothy, Steven, Ryan, and James created Defendant Dolven Enterprises, Inc. ("Dolven"). (*Id.* at ¶ 67.) Timothy, Steven, Ryan, and James each own a twenty-five percent interest in Dolven. In addition, Ryan is CEO and President of Dolven, and Timothy, Steven, and James are officers and directors of Dolven. (*Id.* at ¶¶ 4–6.) GFY continues to be a wholly owned subsidiary of Dolven. (*Id.* at ¶ 9.) Timothy, Steven, and Ryan did not disclose the creation of, or their ownership interests in, Dolven to Tack.

13. Plaintiff alleges that Dolven, "with the guidance and direction of . . . James Dolan," was created to divert cut-and-sew opportunities and other businesses from Plaintiff to Dolven. (*Id.* at ¶ 67.) By the end of 2013, Plaintiff's cut-and-sew business sourced from China "virtually ceased," and Plaintiff eventually shut down

the Reidsville cut-and-sew facility because Timothy and Steven "falsely represented that [Plaintiff] was losing money" and that Plaintiff was not "capable of effectively managing a [cut-and-sew] process." (*Id.* at ¶¶ 68, 70.) Plaintiff further alleges that James "actively participated" with Timothy, Steven, and Ryan "in arranging for and conducting . . . business which was for the benefit of GFY [and] Dolven." (*Id.* at ¶ 86.)

14. In January 2016, Timothy and Steven informed Tack in writing about their involvement with GFY and Dolven and apologized for not informing him about Dolven "from the beginning." (*Id.* at ¶ 89; ECF No. 149.7, at p. 2.) At that time, Plaintiff was negotiating a contract with its largest customer for "one of the largest mattress ticking contracts ever awarded." (ECF No. 149, at ¶ 89.)

15. Plaintiff alleges that because Dolven and GFY had "diverted Plaintiff's opportunities and inserted themselves into the supply chains" of Plaintiff's largest customer with whom Plaintiff was negotiating the contract, Plaintiff was essentially forced to continue working with Dolven in order to service that customer. (*Id.* at ¶ 91.) This caused Plaintiff to defer taking action against Dolven and its principals in order to secure the contract and protect Plaintiff's relationship with the customer. (*Id.*) Once Plaintiff was able to develop the resources and management required to service the contract and the customer, Plaintiff ceased doing business with Dolven and began pursuing legal action against Dolven and its principals.

16. Plaintiff claims that Dolven is actively competing with Plaintiff, has damaged Plaintiff's relationships with its customers and suppliers, and has usurped business opportunities belonging to Plaintiff. (*Id.* at ¶¶ 97, 101.) Plaintiff further

claims that Dolven and its principals are participating in a "scheme to divert [Plaintiff's] business opportunities," (*id.* at ¶ 17), and are continuing to "exploit their knowledge of confidential and proprietary information," (*id.* at ¶ 92). This has given Dolven an unfair competitive advantage over Plaintiff, which Plaintiff claims could not have occurred absent Dolven and its principals' wrongful conduct. (*Id.* at ¶¶ 96, 101.)

17. On August 15, 2017, Plaintiff initiated this lawsuit by filing a Verified Complaint. (ECF No. 4.) On September 25, 2017, James filed his first Motion to Dismiss ("First Motion to Dismiss"; ECF No. 41). Briefing on the First Motion to Dismiss closed, and on December 5, 2017, the Court issued a Notice of Hearing scheduling oral argument on the First Motion to Dismiss for December 20, 2017. (Notice of Hearing, ECF No. 134.) On December 11, 2017, Plaintiff moved to amend its Verified Complaint ("First Motion to Amend"; ECF No. 136). On December 14, 2017, the Court granted Plaintiff's First Motion to Amend. (Order Granting First Mot. to Amend, ECF No. 147.) On December 14, 2017, Plaintiff filed the Amended Complaint (ECF No. 149), rendering James's First Motion to Dismiss moot.

18. In the Amended Complaint, Plaintiff makes the following claims against James and other Defendants: actual and constructive fraud (Third Claim for Relief); conspiracy (Fourth Claim for Relief); common law unfair competition/business conversion (Sixth Claim for Relief); unfair and deceptive trade practices in violation of the North Carolina Unfair Trade Practice Act, N.C.G.S. § 75-1.1 ("UDTPA") (hereinafter, the North Carolina General Statutes will be referred to as "G.S.")

(Seventh Claim for Relief); constructive trust (Tenth Claim for Relief); fraudulent transfer pursuant to G.S. § 39-23.1, et seq. (Eleventh Claim for Relief); and a motion for preliminary and permanent injunction.

19.     James filed his Second Motion to Dismiss on January 9, 2018.  (ECF No. 156.)   Plaintiff filed its brief in opposition to the Second Motion to Dismiss on February 12, 2018 (ECF No. 186), and James filed his reply brief in support of the Second Motion to Dismiss on February 26, 2018 (ECF No. 213).   On February 28, 2018, the Court issued a Notice of Hearing on the Second Motion to Dismiss, setting the hearing for March 14, 2018.  (Notice of Hearing, ECF No. 215.)

20.     On March 12, 2018, Plaintiff filed a motion to further amend its complaint.  (ECF No. 224.)  On April 6, 2018, the Court entered an order granting, in part, and denying, in part, the motion to further amend.   (ECF No. 259.)   The order, *inter alia*, denied Plaintiff's requested amendments relating to James and reserved for ruling the Second Motion to Dismiss based on the allegations in the Amended Complaint.  (*Id.*)

21.     On March 14, 2018, the Court held a hearing on the Second Motion to Dismiss.  The Second Motion to Dismiss is now ripe for resolution.

ANALYSIS

A.     *Standards for dismissal*

22.     James moves to dismiss Plaintiff's claims against him under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, and he also

moves to dismiss Plaintiff's claim for fraudulent transfer under Rule 12(b)(1) for lack of standing.

23.     In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the [C]omplaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). North Carolina is a notice pleading state. *See, e.g.*, *Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 646, 762 S.E.2d 477, 486 (2014)). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought." *Id.*

24.     Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). In deciding a motion to dismiss, the Court must construe the Complaint liberally and accept all well-pleaded allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or

unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). In addition, the Court may consider documents that are the subject of Plaintiff's Complaint and to which the Complaint specifically refers. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

25. Dismissal under Rule 12(b)(1) is proper "[i]f a party does not have standing to bring a claim [because] a court has no subject matter jurisdiction to hear the claim." *Estate of Apple v. Commercial Courier Express, Inc.*, 168 N.C. App. 175, 177, 607 S.E.2d 14, 16 (2005). When considering a motion to dismiss for lack of standing, the Court must "view the allegations as true and the supporting record in the light most favorable to the non-moving party." *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 644, 669 S.E.2d 279, 283 (2008).

26. The burden is on the party invoking jurisdiction to establish standing. *Marriot v. Chatham Cty.*, 187 N.C. App. 491, 494, 654 S.E.2d 13, 16 (2007). The Court will only grant a Rule 12(b)(1) motion "if the material jurisdictional facts are not in dispute and the moving party is entitled to a judgment as a matter of law." *Wilkie v. Stanley*, 2011 NCBC LEXIS 11, *10 (N.C. Super. Ct. Apr. 20, 2011) (citing *Southstar Funding, L.L.C. v. Warren, Perry & Anthony, P.L.L.C.*, 445 F. Supp. 2d 583, 584 (E.D.N.C. 2006)).

B. *Plaintiff fails to allege specific conduct by James in his individual capacity that would support the claims against him in this lawsuit*

27. James first argues that Plaintiff makes no allegations against him in his individual capacity, but merely alleges that as an officer and director of Dolven he

had knowledge of and participated in Dolven's wrongful conduct. (Br. Supp. James Dolan's Mot. Dismiss Am. Compl., ECF No. 157, at pp. 5–8.) James contends that "[i]n the absence of any specific allegations of [James]'s individual wrongdoing, [Plaintiff] has failed to state a single claim" against him, and the claims should be dismissed. (*Id*. at p. 8.) Plaintiff counters that the Amended Complaint sufficiently alleges "specific individual wrongdoing" against James that would support the claims raised in the Amended Complaint. (ECF No. 186, at p. 9.)

28. "[A] director, officer, or agent of a corporation is not, merely by virtue of his office, liable for the torts of the corporation or of other directors, officers, or agents." *Green v. Freeman*, 222 N.C. App. 652, 674, 733 S.E.2d 542, 557 (2012) (quoting *Oberlin*, 147 N.C. App. at 57, 554 S.E.2d at 845); *see also Yates Constr. Co. v. Bostic*, 2014 NCBC LEXIS 19, *6–9 (N.C. Super. Ct. May 12, 2014) (granting summary judgment in favor of defendant corporate director because "plaintiff seemingly base[d] all of its allegations . . . on the mere fact that Defendant was an owner or member of [the defendant corporation] and other entities"). While "[a] director or other corporate agent can . . . be held directly liable to an injured third party for a tort personally committed by the director or one in which he participated," participation requires active involvement in the tortious conduct; mere awareness or knowledge of the alleged wrongdoing is not enough. *Oberlin*, 147 N.C. App. at 57, 554 S.E.2d at 845 (affirming dismissal of complaint for failure to state a claim against three directors despite their having been "fully apprised and informed" of the other director's alleged wrongdoing); *Red Fox Future, LLC v. Holbrooks*, 2014 NCBC LEXIS

8, *36 (N.C. Super. Ct. Mar. 24, 2014) (granting summary judgment in favor of LLC member and finding that the member's "passive awareness of [other members'] actions hardly constitutes active participation"). Consequently, determination of the liability of a corporation for tortious conduct does not automatically also result in a determination of individual liability of its officers or shareholders. *See Red Fox*, 2014 NCBC LEXIS 8, *36–39.

29. James argues that the Amended Complaint only makes generalized allegations against groups of "Defendants" without alleging specific wrongdoing by James. In *Oberlin*, the Court dismissed claims against some of the corporate director defendants because the complaint "[did] not clarify how and to what extent [those] defendants actively and personally participated in the alleged wrongdoing." *Oberlin*, 147 N.C. App. at 57, 554 S.E.2d at 845; *see also Red Fox*, 2014 NCBC LEXIS 8, at *36 (stating that "lump[ing]" an officer in with the corporation and its other officers and directors as having committed wrongful acts did not allege "how and to what extent [the defendant] personally participated" in the alleged acts).

30. The Court has scoured the Amended Complaint and finds that there are few, if any, allegations of specific, affirmative conduct by James that would support several of the claims raised against him by Plaintiff. In addition, Plaintiff does not direct the Court to such allegations regarding James. Instead, the allegations suggest Plaintiff seeks to hold James liable on several claims simply because he was a principal in Dolven and GFY. The allegations generally are not sufficient to support claims against James in his individual capacity. While this alone would be a basis

for dismissing several of the claims against James in this lawsuit, as discussed below, the Court concludes that further analysis of each individual claim is warranted.

C. *Plaintiff fails to allege that James made any misrepresentations, or had a duty to disclose, to Plaintiff, and the claims for actual and constructive fraud fail*

31. In its Third Claim for Relief, Plaintiff alleges that Dolven, GFY, Timothy, Steven, Ryan, and James "actively engaged in a fraudulent scheme to both divert business and money from [Plaintiff]" and to conduct business for Dolven and GFY "to [Plaintiff's] detriment." (ECF No. 149, at ¶ 116.) Plaintiff claims that those Defendants concealed the ownership of Dolven and GFY from Plaintiff and engaged in "thousands of separate and discreet [*sic*] diversions of corporate opportunities and conflict of interest transactions." (*Id.* at ¶¶ 117, 121.) James argues that the Amended Complaint does not sufficiently allege claims against him, individually, for either actual fraud or for constructive fraud. (ECF No. 157, at pp. 11–13.)

32. To state a claim for fraud, the plaintiff must allege the following elements: "(1) [f]alse representation or concealment of a [past or existing] material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 437, 617 S.E.2d 664, 670 (2005). "A claim for fraud may be based on an affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose." *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696, 682 S.E.2d 726, 733 (2009) (internal quotations omitted). "A duty to disclose arises

where: (1) a fiduciary relationship exists between the parties to the transaction; (2) there is no fiduciary relationship and one party has taken affirmative steps to conceal material facts from the other; and (3) there is no fiduciary relationship and one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Id.* (internal quotations omitted); *see also Harton v. Harton*, 81 N.C. App. 295, 297–98, 344 S.E.2d 117, 119 (1986).

33. To state a claim for constructive fraud, a plaintiff must sufficiently allege that the defendant: (1) owes the plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction. *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 620, 730 S.E.2d 763, 767 (2012).

34. Plaintiff does not allege or argue that James made any representations to Plaintiff about anything, let alone an "affirmative misrepresentation of a material fact." *Hardin*, 199 N.C. App. at 696, 682 S.E.2d at 733. Accordingly, any alleged fraud or constructive fraud must be based on the existence of a fiduciary relationship between Plaintiff and James, or some other duty to disclose.

35. Plaintiff does not allege facts that would support a claim that James owed a fiduciary duty to Plaintiff. James was not an officer, director, or agent of Plaintiff, nor was James in a "relation of trust and confidence" with Plaintiff that could have created a fiduciary relationship with Plaintiff. *See Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997). Plaintiff concedes

that James did not owe Plaintiff a direct fiduciary duty, but instead argues that James can be held liable for fraud because Timothy, Steven, and Ryan acted as "agents" for James in breaching their respective fiduciary duties as officers and directors of Plaintiff. (ECF No. 186, at pp. 14–15.) Plaintiff, however, does not direct the Court to any facts that would support the existence of an agency relationship between the parties. There is no basis for holding James liable for alleged breaches of duties owed by Timothy, Steven, or Ryan.

36. Finally, the Amended Complaint does not allege that James had any other duty to disclose to Plaintiff or that he took affirmative steps to conceal the existence of, or his relationship to, Dolven and/or GFY. Instead, the allegations merely support that James never affirmatively disclosed those facts to Plaintiff.

37. Plaintiff does not allege that James made affirmative misrepresentations to Plaintiff, nor does Plaintiff allege that James owed a fiduciary duty to Plaintiff or otherwise actively concealed material facts from Plaintiff. James's Second Motion to Dismiss Plaintiff's claims for actual fraud and constructive fraud against James should be GRANTED.

D. *Plaintiff does not allege that James engaged in any specific conduct for which he could be held liable for common law unfair competition or violation of the UDTPA*

38. Plaintiff next claims that all of the Defendants, including James, engaged in common law unfair competition and violated the UDTPA. (ECF No. 149, at ¶¶ 134–45.) Plaintiff alleges that "Timothy [ ], Steven [ ], Ryan [ ], Garrett [ ] and, upon information and belief, James [ ] agreed to cooperate and act with each other to

carry out the scheme to divert business from [Plaintiff] and engage in the conflict of interest transactions and diversions of corporate opportunities as more particularly alleged herein. . . . and using [Plaintiff]'s confidential information and trade secrets to do so." (*Id.* at ¶¶ 136–37.)

39. A claim for unfair competition seeks to protect "a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money." *Henderson v. U.S. Fid. & Guar. Co.*, 346 N.C. 741, 749, 488 S.E.2d 234, 240 (1997). Conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner." *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008).

40. Plaintiff's claims for common law unfair competition and business conversion both are based on the allegations that Defendants diverted Plaintiff's business to, and used Plaintiff's trade secrets for the benefit of, Dolven and GFY. Accordingly, the Court construes Plaintiff's claims for common law unfair competition and business conversion as a single claim. *See Superior Performers, Inc. v. Meaike*, No. 1:13CV1149, 2014 U.S. Dist. LEXIS 158862, *26 (M.D.N.C. Nov. 10, 2014) ("The allegations of wrongdoing, however, as to both Plaintiff's claim for unfair competition

and business conversion, are the same. Therefore, the court will address the torts for unfair competition and business conversion together . . . .").

41. The elements of a claim for unfair and deceptive trade practices in violation of the UDTPA are: "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *McLamb v. T.P. Inc.*, 173 N.C. App. 586, 593, 619 S.E.2d 577, 582 (2005). An act or practice is unfair when it is offensive to public policy or when it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Pinehurst, Inc. v. O'Leary Bros. Realty, Inc.*, 79 N.C. App. 51, 59–60, 338 S.E.2d 918, 923 (1986). An act or practice is deceptive if it has the capacity or tendency to deceive. *Id.* at 60, 338 S.E.2d at 923.

42. "The standard which a plaintiff must meet to recover on an unfair competition claim under the common law is not appreciably different" from the standard applied to unfair and deceptive trade practices claims. *BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 615 (M.D.N.C. 1999) (citing *Carolina Aniline & Extract Co. v. Ray*, 221 N.C. 269, 273, 20 S.E.2d 59, 61–62 (1942)); *see also RE/MAX LLC v. M.L. Jones & Assocs.*, Civ. No. 5:12- CV-768-D, 2013 U.S. Dist. LEXIS 123863, *11 (E.D.N.C. Aug. 29, 2013) (quoting *BellSouth Corp.*, 42 F. Supp. 2d at 721 n.1).

43. Plaintiff does not allege that James engaged in any specific unfair or deceptive acts. Instead, Plaintiff broadly alleges that James knew that Timothy and Steven were officers and directors of Plaintiff and that James "actively participated"

in the diversion of business opportunities from Plaintiff, apparently as a principal of GFY and Dolven. (ECF No. 149, at ¶¶ 84, 86.) As discussed above, James cannot be held liable for GFY's and Dolven's conduct merely because he was a shareholder and officer of those corporations. James did not owe a duty to Plaintiff. To the extent that the Defendants' diversion of business from Plaintiff to GFY or Dolven created allegedly "unfair" competition in the marketplace with Plaintiff, James's "mere participation" in a competitive enterprise is not unfair or deceptive. *See Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, *60 (N.C. Super. Ct. Oct. 21, 2016).

44.     To the extent Plaintiff claims that the Defendants converted Plaintiff's confidential business information and trade secrets, Plaintiff does not allege how James was involved in the conversion other than that he is a principal in GFY and Dolven. In addition, Plaintiff does not plead that the alleged conversion deprived Plaintiff of the use of the trade secrets. *See Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, *18 (N.C. Super. Ct. June 9, 2017) (dismissing certain conversion claims where plaintiff did not allege that defendants had deprived plaintiffs of the alleged trade secret information); *Horner Int'l Co. v. McKoy*, 2014 NCBC LEXIS 68, *8 (N.C. Super. Ct. Dec. 18, 2014) ("Plaintiff has not alleged that it does not still have access to the records and information that Defendant took.").

45.     The Amended Complaint does not allege sufficient facts to support its claim that James's conduct was unfair, deceptive, or otherwise unlawful towards

Plaintiff. James's Second Motion to Dismiss Plaintiff's claim for unlawful competition/business conversion against James should be GRANTED.

E. *Plaintiff sufficiently alleges a claim for civil conspiracy against James*

46. In its Fourth Claim for Relief, Plaintiff alleges that James and the other Defendants "agreed to cooperate and act with each other to carry out the scheme to divert business from [Plaintiff] and engage in the conflict of interest transactions and diversions of corporate opportunities." (ECF No. 149, at ¶ 124.) James argues that Plaintiff has failed to state a claim for civil conspiracy against James individually, rather than in his capacity as a director and owner of Dolven, and that Plaintiff relies on legal conclusions and not facts to allege the existence of a conspiracy.

47. Civil conspiracy is not an independent cause of action in North Carolina; rather, liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct. *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002). To state a claim for civil conspiracy, a plaintiff must allege: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Piraino Bros., LLC v. Atlantic Fin. Grp., Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333 (2011).

> In civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts. The charge of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all.

*Shope v. Boyer*, 268 N.C. 401, 405, 150 S.E.2d 771, 773–74 (1966); *see also GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 39, \*20 (N.C. Super. Ct. Sept. 9, 2011) ("Having joined the conspiracy, [two individual defendants] became exposed to liability with [co-defendant] and any other co-conspirators for damages caused by any act in furtherance of the common scheme."). The gravamen of an action for civil conspiracy "is the resultant injury, and not the conspiracy itself." *Henry v. Deen*, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984); 16 Am. Jur. 2d *Conspiracy* § 50 (2017).

48. Plaintiff alleges that James, Timothy, Steven, Ryan, and Garrett "agreed to cooperate and act with each other to carry out the scheme to divert business from [Plaintiff] and engage in the conflict of interest transactions and diversions of corporate opportunities." (ECF No. 149, at ¶ 124.) Plaintiff alleges that James participated in the alleged "scheme" by forming GFY and Dolven and by generally advising GFY and Dolven with regard to their businesses, apparently in his role as an officer and director. Finally, Plaintiff alleges that in furtherance of the conspiracy, Timothy, Steven, Ryan, and Garrett breached fiduciary duties owed to Plaintiff and engaged in other unlawful conduct that injured Plaintiff. (*Id*. at ¶¶ 126–29.)

49. James argues that by alleging that he conspired with Timothy, Steven, and Ryan, Plaintiff is merely trying to hold James liable for his acts as an officer and director of Dolven and that James is protected from the claim for conspiracy by intra-corporate immunity since directors and officers of a corporation cannot conspire with one another. (ECF No. 157, at pp. 18–20); *see, e.g.*, *State ex rel. Cooper v. Ridgeway*

*Brands Mfg., LLC*, 184 N.C. App. 613, 625, 646 S.E.2d 790, 799 (2007) ("The doctrine of intracorporate immunity holds that, since at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself, just as an individual cannot conspire with himself. An allegation that a corporation is conspiring with its agents, officers or employees is tantamount to accusing a corporation of conspiring with itself." (internal citations omitted)).

50. The Court is not persuaded by James's argument. Plaintiff alleges that James conspired with Timothy, Steven, and Ryan not only as directors and officers of Dolven, but also in their roles as directors and officers of Plaintiff. As Plaintiff contends, it was Timothy's, Steven's, and Ryan's positions with Plaintiff that permitted them to carry out the alleged plan to divert Plaintiff's business and opportunities to Dolven. (ECF No. 186, at p. 21.) The doctrine of intra-corporate immunity is not applicable to these allegations.

51. Plaintiff has alleged that an agreement existed between James and the other Defendants to divert business and opportunities from Plaintiff, that James's co-conspirators committed unlawful acts in furtherance of the agreement, and that Plaintiff was injured by those acts. While the Amended Complaint provides no details as to James's specific role in the conspiracy, the Court recognizes that "it is difficult to dismiss a conspiracy claim summarily because the elements of a conspiracy claim are broadly stated." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, *48 (N.C. Super. Ct. Apr. 23, 2015). Therefore, James's Second Motion to Dismiss Plaintiff's claim for civil conspiracy against James should be DENIED.

F. *Plaintiff states a claim for violation of the UVTA because a transfer has occurred under the UVTA, and the Court may award any other relief the circumstances may require*

52. Plaintiff also makes a claim against James for fraudulent transfer under the Uniform Voidable Transactions Act ("UVTA"), G.S. § 39-23.1 et. seq. (ECF No. 149, at ¶¶ 157–61.) The UVTA permits a creditor to bring a civil action against a debtor for certain transactions made by the debtor. A "transfer made or obligation incurred" is voidable as to a creditor if the debtor made the transfer:

> (1) with intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

G.S. § 39-23.4(a).[1] A "transfer" is any method by which a debtor "dispos[es] of or part[s] with an asset." G.S § 39-23.1(12).

53. Plaintiff alleges that it is a creditor of James because it has claims against him in this lawsuit. (ECF No. 149, at ¶ 158.) Plaintiff further alleges that James, Timothy, Steven, Ryan, and Dolven have entered into an agreement under which James, Timothy, and Steven intend to sell their respective 25% ownership interests in Dolven to Dolven and Ryan. (*Id.*) Plaintiff argues that although the transaction has not yet occurred, the obligation to transfer the shares "has been

---

[1] Plaintiff does not seek relief under the provisions of G.S. § 39-23.5, which applies only to transfers involving insolvent debtors.

incurred and . . . can be effectuated at any time." (*Id.*) Plaintiff alleges that the contemplated transfer "amounts to a scheme . . . to attempt to defraud, hinder and delay [Plaintiff] . . . from having lawful recovery" from James and seeks to enjoin the transfer. (*Id.* at ¶¶ 158–60.)

54. James does not challenge that Plaintiff is a "creditor" under the UVTA, but instead argues that Plaintiff lacks standing to bring the claim because James has not yet made a transfer within the meaning of the UVTA, and the Court cannot, or should not, enjoin a future transfer. (ECF No. 157, at pp. 14–15.) James contends that the plain language of the statute makes relief under section G.S. § 39-23.4(a) applicable only to a "transfer *made* or obligation *incurred*," and not to prospective transfers (emphasis added). Plaintiff counters that G.S. § 39-23.7(a)(3) authorizes the Court to enjoin the prospective transfer of assets by providing that a court may issue "[a]n injunction against further disposition by the debtor . . . of the asset transferred" and to provide "any other relief the circumstances may require." (ECF No. 186, at pp. 16–17); G.S. § 39-23.7(a)(3)(a)–(b). James argues that G.S. § 39-23.7(a)(3) only permits the Court to enjoin the "further" transfer of assets that have already been, at least in part, fraudulently transferred. (ECF No. 213, at pp. 10–11.)

55. The parties have not cited any authority directly on point to guide the Court in analyzing the issue of whether the Court can enjoin the future transfer of assets that have not yet occurred. The Court's research has yielded only one case dealing with a similar issue, *Akanthos Capital Mgmt., LLC v. CompuCredit Holdings*

*Corp.*, 770 F. Supp. 2d 1315 (N.D. Ga. 2011).[2]  In *Akanthos*, the court concluded that for purposes of defining a "transfer" under the UVTA, "the relevant inquiry is not whether a transfer has occurred, but whether the obligation to make the transfer has been incurred."  *Id.* at 1331.  Here, Plaintiff alleges that James has entered into a binding agreement, and incurred an obligation, to transfer his shares in Dolven.  Applying the reasoning in *Akanthos*, this allegation would appear to be sufficient to plead that a "transfer" has occurred because the obligation to make that transfer has been incurred.

56.    In addition, the UVTA provides the Court with authority to provide "[a]ny other relief the circumstances may require."  G.S. § 39-23.7(a)(3).  The Court concludes at the motion to dismiss stage that Plaintiff has sufficiently alleged a claim under the UVTA that may include the injunction of the transfer of James's ownership interest in Dolven.  *See Akanthos*, 770 F. Supp. 2d at 1335 ("[T]he UFTA permits the Court to award [a]ny other relief the circumstances may require . . . . [and] Defendants have given the Court no reason to assume that the statute actually means any other relief *except* for an injunction." (internal quotations and citations omitted) (emphasis in original)).  James's Second Motion to Dismiss Plaintiff's fraudulent transfer claim under the UVTA is DENIED.

---

[2] Although the statutory scheme in Georgia is referred to as the Uniform Fraudulent Transfers Act, the texts of the relevant statutory provisions are identical in the North Carolina and Georgia statutes at issue.  *Compare* G.S. § 39-23.7(a)(3), *with* Ga. Code Ann. § 18-2-77(a)(3).

G.  *Plaintiff's claim for the equitable remedy of a constructive trust against James should be dismissed*

57.    In its Tenth Claim for Relief, Plaintiff alleges in relevant part that it is entitled to a constructive trust "with respect to all money and other property received by" James as a result of his "unlawful conduct." (ECF No. 149, at ¶ 155.)  James counters that a constructive trust should not be imposed on his personal assets because James did nothing unfair or inequitable to warrant the imposition of a constructive trust.

58.    A claim for a constructive trust is not an independent cause of action, but rather is an equitable remedy used to prevent unjust enrichment "acquired through fraud, breach of duty or some other circumstance making it inequitable for [defendant] to retain [the property]." *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211, 171 S.E.2d 873, 882 (1970).  Accordingly, a constructive trust requires the "common, indispensable element" of "some fraud, breach of duty or other wrongdoing by the holder of the property." *Id.* at 212, 171 S.E.2d at 882.  "[A] constructive trust ordinarily arises out of the existence of fraud, actual or presumptive—usually involving the violation of a confidential or fiduciary relation—in view of which equity transfers the beneficial title to some person other than the holder of the legal title." *Leatherman v. Leatherman*, 297 N.C. 618, 621–22, 256 S.E.2d 793, 795–96 (1979) (quoting *Bowen v. Darden*, 241 N.C. 11, 13–14, 84 S.E.2d 289, 292 (1954)).

59.    The Court already has concluded that Plaintiff has not pleaded facts to support the allegation that James owed Plaintiff a fiduciary duty and has dismissed the claims for actual and constructive fraud against James.  Therefore, Plaintiff does

not allege the type of wrongdoing on the part of James that would support the imposition of a constructive trust on any of his assets. James's Second Motion to Dismiss the claim for a constructive trust against James should be GRANTED.

H. *Motion for permanent injunction*

60. Neither party makes argument regarding Plaintiff's Twelfth Claim for Relief, styled as a "Motion for Preliminary and Permanent Injunction." (ECF No. 149, at ¶¶ 162–63.) The Court has denied Plaintiff's motion for preliminary injunction as to all the Defendants, including James. (ECF No. 129.) Nevertheless, since Plaintiff's claims against James for civil conspiracy and fraudulent transfer survive dismissal, the Court will not at this time dismiss the claim for a permanent injunction against James. James's Second Motion to Dismiss the claim for permanent injunction against James should be DENIED.

THEREFORE, IT IS ORDERED that:

61. The Second Motion to Dismiss is GRANTED, in part, and DENIED, in part.

62. The Second Motion to Dismiss Plaintiff's claim against James for fraud and constructive fraud is GRANTED.

63. The Second Motion to Dismiss Plaintiff's claim against James for common law unfair completion/business conversion and for violation of the UDTPA is GRANTED.

64. The Second Motion to Dismiss Plaintiff's claim against James for civil conspiracy is DENIED.

65.     The Second Motion to Dismiss Plaintiff's claim against James for fraudulent transfer under the Uniform Voidable Transactions Act is DENIED.

66.     The Second Motion to Dismiss Plaintiff's motion against James for permanent injunction is DENIED.


SO ORDERED, this the 5th day of June, 2018.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases